RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LYNN MICHAEL LAVICTOR,

*Defendant-Appellant.*

No. 15-1580

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:14-cr-00030—R. Allan Edgar, District Judge.

Argued: November 29, 2017

Decided and Filed: February 3, 2017

Before: DAUGHTREY, CLAY, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Andrew Marino, VANDERBILT LAW SCHOOL APPELLATE LITIGATION CLINIC, Nashville, Tennessee, for Appellant. Jeff Davis, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** C. Mark Pickrell, VANDERBILT LAW SCHOOL APPELLATE LITIGATION CLINIC, Nashville, Tennessee, Christopher F. Cowan, THE LAW OFFICE OF C. F. COWAN, P.L.L.C., Columbus, Ohio, for Appellant. Jeff Davis, Hannah Bobee, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Defendant Lynn Michael LaVictor appeals denial of his motions for a judgment of acquittal and a new trial under Federal Rule of Criminal Procedure 29 and

Rule 33, respectively.[1]   He also appeals a number of evidentiary rulings made by the district court during his trial for the sexual assault of his girlfriend, hereinafter referred to as "C.B."  For the reasons set forth below, we **AFFIRM** the district court's judgment.

## BACKGROUND

### I.     Factual background

On June 27, 2014, after a night of heavy drinking, LaVictor and C.B. returned to LaVictor's mother's house on the Sault Ste. Marie Tribe of Chippewa Indians Reservation. Around three in the morning, LaVictor contacted emergency services to notify them that C.B., his girlfriend, was bleeding from her vagina.  Following a brief conversation, the dispatcher told LaVictor to monitor C.B. and call back if her condition failed to improve. Approximately thirty minutes later, LaVictor called again to request assistance.

Tribal police arrived on scene with emergency personnel to examine C.B.  LaVictor informed the officer on the scene that he and C.B. had engaged in consensual sex on the couch. Blood stains were identified on the living room carpet.  At the time, C.B. told the first responders that while having sex, LaVictor became angry and then stuck an unknown object inside of her. C.B. was taken to the emergency room while LaVictor remained in his mother's house.

Upon her arrival to War Memorial Hospital at 4:30 in the morning, C.B. was admitted directly to the emergency room because of internal vaginal bleeding and swelling.  Dr. Nelu Cristof, a gynecologist, performed surgery on C.B. to repair a two-centimeter perineal laceration, as well as lacerations extending up the vaginal mucosa and underlying fascia.  Testifying at trial, Dr. Cristof expressed doubt that an erect penis caused C.B.'s injuries.  Medical staff continued to question C.B. about the extent of her injuries and the events of the previous night.  Nurse Christina Simpson testified that C.B. stated that LaVictor had put something inside of her.

---

[1]LaVictor was found guilty and sentenced to 355 months in prison for the following criminal acts: (1) Attempted Sexual Abuse, 18 U.S.C. § 2242(2)(B); (2) Aggravated Sexual Abuse through vaginal penetration, 18 U.S.C. § 2241(a)(1); (3) Aggravated Sexual Abuse through anal penetration, 18 U.S.C. § 2241(a)(1); (4) Assault Resulting in Serious Bodily Injury, 18 U.S.C. § 113(a)(6); (5) Domestic Assault Habitual Offender, 18 U.S.C. § 117; (6) Witness Tampering, 18 U.S.C. § 1512(b)(1).

C.B. would later inform Nurse Simpson that LaVictor inserted a wine bottle into her vagina and anus. Although C.B. declined a sexual assault examination, the police were contacted.

Tribal police officer Daniel Menard arrived at the hospital to interview C.B. He observed her lying in bed, crying, and complaining of pain. C.B. began to cry vociferously as soon as Officer Menard inquired about LaVictor and the incident in question. Recounting the events of the previous night, C.B. told the officer that she and LaVictor went to several bars and the next thing she could remember was waking up naked on LaVictor's floor. She mentioned to Officer Menard that something did not feel right, but refused to divulge any further information. Instead, C.B. asked Officer Menard to leave. He complied and went directly to LaVictor's home to interview him. LaVictor reiterated that the sex from the previous night was consensual. He explained that they regularly enjoy "crazy sex" which frequently "turns rough." At the time, LaVictor denied using a foreign object inside of C.B., instead claiming that C.B. commonly bled from her vagina during sexual intercourse. When Officer Menard returned to the hospital, C.B. asked him to retrieve her personal items from LaVictor's residence. In the course of doing so, LaVictor asked Officer Menard whether he could see C.B. Upon being informed of LaVictor's desire to visit, C.B. started visually trembling and explicitly requested that he be denied entry.

Dr. Madeleine Guevara, an obstetrician-gynecologist, was assigned to provide post-operative care to C.B. Initially, C.B. was reticent and scared. Eventually, she confided to Dr. Guevara that she had nightmares. Expressing fear that LaVictor would assault her, she acknowledged her involvement in a progressively worsening violent domestic relationship with LaVictor and noted that this situation would be the last straw. C.B. denied that her injuries arose because of "frisky sex;" rather, she stated that LaVictor caused her injuries by placing a wine bottle inside of her. Nonetheless, C.B. was unwilling to press charges.

The day after speaking to Officer Menard, LaVictor called and requested an in-person meeting, which transpired at the police station. Upon reiterating the consensual nature of his and C.B.'s sexual encounter, LaVictor confessed to using a sex toy with C.B. He brought it along to show Officer Menard. The toy was shaped in the form of a life-sized rubber arm and fist.

In light of mounting evidence of abuse, hospital personnel persuaded C.B. to talk with a counselor from a local domestic abuse center on June 29, 2014.  After her conversation with the counselor, C.B. requested to speak to Officer Menard.  Their conversation recounted the events of the previous night and was memorialized in a five-page affidavit C.B. wrote out.  On the basis of her statement, tribal police executed a search warrant of LaVictor's home, seizing the sex toy, a blood soaked rug, and two empty wine bottles.

## II.   Procedural background

### A.  Grand Jury testimony

On July 22, 2014, C.B. testified before the grand jury. During the proceedings, C.B. admitted writing a five-page statement that chronicled the sexual assault. Specifically, she testified:

> Q: And then you state that there is a moment after midnight where I don't recall?
>
> A: Yes
>
> Q: And then it states that, I remember laying on the floor naked?
>
> A: I wrote that, yes, that's correct.
>
> Q: Okay. I am – Yes, we are going over it.  You immediately asked for your clothes. Do you see that?
>
> A: Um-h'm.
>
> Q: Okay. You agree with that?  Lynn was already furious.  He said, no, you are not getting your clothes.  I know this is difficult, and if you have to take a break, just let me know.  We can stop.  Okay?  Do you see that?
>
> A: Yes.
>
> Q: Okay.  Then he accuses you, when you ask for your clothes, of wanting to see someone else; correct?  Yes or no?  Remember, you have to –
>
> A: Yes. It is, yes. It is true, yes.

(R. 165-5, Tr., PageID # 2780). The testimony continues:

> Q: Okay.  And then he continues to get upset.  Then you state that he forced your legs open.  Do you see that?
>
> A: Yes.
>
> Q: And then you state, I don't feel like doing that.

A: Yeah.

Q: And you put in there, meaning sex?

A: Yes.

Q: Okay. Then he gets upset – more upset and he says you are mine. You are doing whatever I want. Do you see that?

A: Yes.

Q. That's what he told you?

A: Yep?

Q: He pushed his fingers into your vagina?

A: Yes, I remember it.

Q. Okay, and you yelled, stop it. It hurts. Why do you have to do that so hard? Do you see that?

A: Yes.

Q: And his response was, never mind, shut up. And you again say, you are hurting me?

A: Yeah, that's - -

Q: And then you – he –You state that he opened me so roughly like it wasn't real skin. That's how it felt to you?

A: Oh, my God. Yes.

Q: And then you tried to get up, and he is more angry and he says, lay down, bitch, put his elbow along your eyebrow area, twisting you head sideways? Do you see what you said there, I closed my eyes and I knew this was going to be a battle . . .

A: Um-h'm

Q: -- again?

A: Yeah.

(*Id.* at 2781–83). C.B. further acknowledged that LaVictor slapped her, cursed at her, and forced himself inside of her without consent. (*Id.* at 2783) She kept yelling at him to stop and that he was hurting her, but he refused to do so until her vagina bled. (*Id.*) At the conclusion of her testimony, the prosecutor offered C.B. several opportunities to supplement or amend her testimony. C.B. simply stated that she loved LaVictor and did not want anything bad to happen to him. (*Id.* at 2788) She informed the prosecutor that the affidavit was written in the hospital at a time she was highly emotional and angry. But at no point did she recant her testimony.

**B. Pre-trial proceedings**

On July 22, 2014, a five-count indictment charged LaVictor with, *inter alia*: (1) attempted sexual abuse pursuant to 18 U.S.C. § 2242(2)(B) ("Count One"); (2) aggravated sexual abuse pursuant to 18 U.S.C. § 2241(a)(1) ("Count Two" and "Count Three"); (3) assault resulting in serious bodily injury pursuant to 18 U.S.C. § 113(a)(6) ("Count Four"); and, (4) domestic assault by a habitual offender pursuant to 18 U.S.C. § 117 ("Count Five"). LaVictor was arrested on July 30, and arraigned a few days later by a magistrate judge who ordered that he have no contact with C.B.

Despite this order, LaVictor sent a letter nominally addressed to his mother with an attached affidavit that he requested C.B. copy in her own handwriting. It stated:

> I [C.B.] do solemly [sic] swear that the statement I'm writing is the absolute truth. At no time has Lynn LaVictor abused me violently in any way shape or form. Furthermore Lynn LaVictor has never abused me sexually ever. All sexually [sic] activity between Lynn LaVictor has at all times been consentually [sic]. All statements incriminating Lynn LaVictor of sexuall [sic] misconduct were made while I was under the influence and have no validity. I love Lynn LaVictor and am absolutely in no way in fear of him in any way shape or form. These alledged [sic] allegations are categorically untrue. In regards to case #2:14-CR-00030-RHB counts 1 through 5. Date it & have notarized [sic].

(Gov't Ex. 14(A), App. 16–19). Consequently, the grand jury returned a superseding indictment on September 9, 2014 against LaVictor adding additional charges of witnessing tampering pursuant to 18 U.S.C. § 1512(b)(1) ("Count Six") and contempt pursuant to 18 U.S.C. § 401(3) ("Count Seven").

On November 4, 2014 a detention hearing was held. During the hearing, C.B. testified that she and LaVictor routinely engaged in rough sex that involved the use of foreign objects. She claimed to have always consented, including the night of the alleged assault. She disavowed her previous statement, explaining that she was angry at LaVictor for not coming to visit her at the hospital. She insisted that she always wanted to have sex and that the only reason she filed a protective order—a protective order that she would ultimately have retracted—was because she was confused and persuaded to do so by hospital workers.

**C. Trial**

The case proceeded to trial. During the trial, the government called C.B. as a witness. On the witness stand, she denied that LaVictor sexually assaulted her. Instead, she explained that in the course of their relationship they used foul language and enjoyed rough sex. The government moved to admit, over the objection of LaVictor, her grand jury testimony. Additionally, the prosecution sought to impeach C.B. with her prior written statement. Explaining the statement, C.B. attributed her previous remarks to intoxication and a personality disorder. She also testified that following the hospitalization, the couple resumed their relationship.

Additionally, the government called Dr. Amy Bonomi, an expert witness, to testify about the dynamics of victim recantation. LaVictor objected to Dr. Bonomi's proposed testimony. The district court conducted a *Daubert* hearing and found the testimony admissible. On cross-examination, LaVictor's attorney challenged the applicability of the testimony to the facts of this case. Dr. Bonomi acknowledged never having met with the victim or reviewed any evidence in connection with the case. The government also introduced, over LaVictor's objection, several witnesses to testify about uncharged episodes of prior abuse. After less than three hours of deliberation, the jury returned guilty verdicts on all six counts.[2]

**D. Post-trial motions and sentence**

Following the trial, LaVictor moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Rule 33.[3] LaVictor argued in both motions that the evidence was insufficient to sustain his convictions. He again raised previous evidentiary challenges. The trial court denied both motions and rejected any evidentiary objections. The district court sentenced LaVictor on May 11, 2015 to concurrent prison terms of 355 months on Counts One to Three, 120 months on Count Four, 60 months on Count Five, 240 months on Count Six, and 6 months on Count Seven. This timely appeal followed.

---

[2]Prior to trial, LaVictor pleaded guilty to the contempt charge.

[3]LaVictor had previously moved for judgment of acquittal at the close of the government's case and renewed the motion at the close of all the evidence, which the district court denied.

**DISCUSSION**

**I.      Admission of Expert Testimony**

**A.  Standard of Review**

This Court reviews a district court's decision to admit proposed expert testimony for abuse of discretion.  *United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012).  "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence."  *Best v. Lowe's Home Cntrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009) (quoting *Brown v. Raymond Corp.,* 432 F.3d 640, 647 (6th Cir. 2005)).

**B.  Analysis**

LaVictor challenges the district court's decision to admit Dr. Bonomi's expert testimony on domestic violence and victim recantation.  Federal Rule of Evidence 702 outlines the standard for admissibility regarding expert testimony, providing that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the Supreme Court explained that Rule 702 confers a "gatekeeping role" on trial judges to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. 579, 597 (1993).  *Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading "junk science" on the other.  *Best*, 563 F.3d at 176–77.  For expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable.  *Daubert*, 509 U.S. at 589.  There is no "definitive checklist or test" for striking this balance, but the Supreme Court in *Daubert* did identify four factors that normally bear on the inquiry:

whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Semrau*, 693 F.3d at 520.

The district court conducted a *Daubert* hearing to evaluate the qualifications of the expert and the probative value of her testimony. First, the district judge concluded she was qualified to testify based on her academic background. Second, the trial court found her testimony to be relevant to the case because of the alleged domestic violence. Finally, the district court determined that her testimony was reliable because it was based on peer-reviewed research. Recognizing that any issues with methodology or credibility could be best addressed during cross-examination, the trial court allowed her testimony. LaVictor challenges each conclusion.

### 1. Relevance

LaVictor first challenges the relevance of Dr. Bonomi's testimony, believing that the government proffered insufficient facts that C.B. was a victim of domestic violence. LaVictor also argues that such testimony infringes upon the jury's traditional role of evaluating the credibility of witnesses—here C.B. We disagree.

Foremost, we reject LaVictor's contention that an insufficient basis was established for Dr. Bonomi's testimony. Relying upon *United States v. LeBlanc*, 45 F. App'x 393, 400–01 (6th Cir. 2002), LaVictor claims that the government did not present enough evidence of domestic abuse to lay the foundation for Dr. Bonomi's testimony. However, he misreads *LeBlanc*. In *LeBlanc*, this Court affirmed the decision of a district court, which excluded a defendant's expert from testifying about child suggestibility during questioning when the defendant did not point "to a *single* instance in which [the child] was supposedly subjected to allegedly coercive or suggestive questioning techniques" during the *Daubert* hearing. *Id.* at 400 (emphasis added). Unlike in *LeBlanc*, ample evidence exists in the record to support a finding that C.B. was involved in an abusive relationship. C.B. previously reported that LaVictor punched and choked her in March 2014. Then, in the course of her hospitalization, C.B. confided to Dr. Guevara that

she was in a violent domestic relationship that was getting progressively worse.  Moreover, her grand jury testimony detailed prime examples of abuse and sexual assault.  The district court is free to conclude that the facts "fit" the case, so long as such conclusion is supported by a preponderance of the evidence.  And we see no fault with the district court's conclusion in this case.

Likewise, we reject LaVictor's argument that Dr. Bonomi's testimony was not helpful to the jury.  The relevancy bar is low, demanding only that the evidence "logically advances a material aspect of the proposing party's case."  *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196–97 (9th Cir. 2014).  This Court has held that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact."  *Mactec, Inc. v. Bechtel Jacobs Co., LLC*, 346 F. App'x 59, 77 (6th Cir. 2009) (quoting *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998)).  The "rejection of expert testimony is the exception, rather than the rule."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008).  When there is a factual issue in dispute that expert testimony can clarify, there are limited grounds for rejecting the testimony of the expert witness.  *See Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 527–28 (6th Cir. 2014) (reversing the decision of the lower court to not admit an expert witness who could explain a factual point in dispute).  There is a factual issue in dispute—whether or not C.B. consented.  Dr. Bonomi's proposed testimony provides the jury with an explanation for the contradictory evidence in the record.  Because a strong factual foundation exists upon which to conclude that C.B. and LaVictor were involved in an abusive relationship, Dr. Bonomi's testimony can clarify the issue in dispute.  Therefore, we believe that such testimony is highly probative and helpful to the jury.

Finally, LaVictor claims testimony that aids the jury in weighing a victim's credibility is improper.  But courts draw a distinction between expert testimony offered on a witness's motivation to lie in a straightforward case where the benefit can be readily understood by a layperson versus a case involving a more esoteric subject matter like domestic abuse.  *Compare United States v. Henry*, 71 F. App'x 493, 503–04 (6th Cir. 1993) (holding that a jury did not need expert testimony on a witness' motivation to lie in order to receive a lower sentence because it was "within the realm of common sense") *with Thomas v. Lampert,* 349 F. App'x 272,

278 (10th Cir. 2009) ("[f]or years, federal courts have allowed experts to offer their opinions regarding battered woman's syndrome to *explain* the contradictory testimony of victims of abuse") (emphasis added). An overwhelming number of federal courts accept that the dual phenomenon of battered woman's syndrome and victim recantation are beyond the knowledge of an average juror, and therefore allow expert witnesses to offer testimony in such cases. *See*, *e.g.*, *United States v. Young*, 316 F.3d 649, 657 (7th Cir. 2002) (finding that it was not an abuse of discretion to admit testimony by an expert to explain a victim's recantation); *United States v. Alzanki*, 54 F.3d 994, 1009 (1st Cir. 1995) (noting that testimony concerning abuse in relationships was highly material, somewhat technical, and beyond the realm of acquired knowledge normally possessed by lay jurors); *Arcoren v. United States*, 929 F.2d 1235, 1241 (8th Cir. 1991) (a "jury naturally would be puzzled at the complete about-face made, and would have great difficulty in determining which version of testimony it should believe . . . [and] if there was some explanation for [the] changed statements, such explanation would aid the jury in deciding which statements were credible."). Although this Circuit's pronouncements on the issue have been more muted, we did recognize in an unpublished decision that an expert witness's testimony on why victims do not report incidents of domestic abuse was relevant. *See United States v. Smith*, 142 F.3d 438 (6th Cir. 1998) (holding that the district court did not abuse its discretion in allowing such testimony). We reaffirm that conclusion now.

## 2. Reliability

LaVictor also challenges the reliability of Dr. Bonomi's testimony, arguing that her testimony is insufficiently supported by statistical evidence. Specifically, he contends that her reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, and lack of scientific testing, disqualify her opinion. The district court found Dr. Bonomi's methodology reliable and cited her voluminous publication history in support of this conclusion. We identify no abuse of discretion in the district court's holding.

Federal Rule of Evidence 702 does not limit the subject matter of expert testimony to scientific or technical evidence. Rather, it is the district court's duty to ensure that all expert evidence is based "on a reliable foundation." *Daubert*, 509 U.S. at 597. And while *Daubert* identifies a number of potential considerations for determining reliability, this Circuit has

previously recognized that a district court operates with wide latitude in "deciding how to test an expert's reliability," and, as such, must be afforded "considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." *Clark v. W & M Kraft, Inc.*, 476 F. App'x 612, 616 (6th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Consequently, the district court is not bound by any explicit test when determining reliability.

Courts have consistently allowed expert witnesses to testify concerning domestic violence even in circumstances where the research is not supported by exhaustive statistical evidence. *See, e.g., United States v. Simmons*, 470 F3d 1115, 1122 (5th Cir. 2006) (finding an expert's testimony reliable concerning the behavior of rape victims even though the research lacked "empirical validity and ascertainability of error rate"); *Beauchamp v. City of Noblesville*, 320 F.3d 733, 745 (7th Cir. 2003) (expert's citing anecdotal rape research to explain victim's "failure to immediately notify the police that she had been raped" and her "inability to recall the details of the crime clearly" could "be consistent with that of a person who was raped"); *Smith*, 142 F.3d at 438 (admitting psychologist's testimony that "she was familiar with reactions of women who have been victims of rape or sexual assault and that women often do not report the incidents immediately" to rebut defendant's assertion that alleged victims "were unreliable because they did not immediately report their rapes and assaults"); *Alzanki*, 54 F.3d at 1006 (upholding, as reliable under *Daubert*, testimony based on expert's general research and personal interaction with hundreds of abuse victims that alleged victim's "behavioral response to the non-sexual abuse administered by the [defendants] was consistent with the behavior of abuse victims generally").

Given the discretion district courts enjoy when making reliability determinations, we see no grounds for reversal. Dr. Bonomi's testimony was based on insight gleaned from her personal experience interviewing victims of domestic abuse. Such research was published in peer-reviewed journals. Peer review is an effective way for a district court to weed out junk science. *Daubert*, 509 U.S. at 594 (finding that reliability is enhanced if the research is "subject[ed] to the rigors of peer review and publication."). Any remaining qualms LaVictor harbored about Dr. Bonomi's research could be addressed by "cross-examination and jury

instructions [that] can be used to question the qualifications of the proffered expert, undermine the basis of the expert's theories, explain the limits of social science's validation studies and pick apart research methods." *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000). Consequently, we find Dr. Bonomi's research to be sufficiently reliable, and thus admissible.

### 3. Prejudice

Lastly, LaVictor argues that the probative value of Dr. Bonomi's testimony is substantially outweighed by the danger of its unfair prejudice. Under Rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *United States v. Collins*, 799 F.3d 554, 588 (6th Cir. 2015). This Court has consistently held that "[a] district court has very broad discretion in making this determination." *Semrau*, 693 F.3d at 523 (quoting *Smithers,* 212 F.3d at 322). "[A] consideration of Rule 403 is included in the *Daubert* analysis." *Id.*

We see no error in the district court's conclusion concerning the balancing of the evidence. Although some of Dr. Bonomi's testimony may have involved graphic language and pertained to troubling subject matter, it was highly probative. Jurors were presented with evidence of purported abuse. Yet, C.B. refused to acknowledge this at trial. Her contradictory actions may have confused the jury. By explaining the process of victim recantation, Dr. Bonomi's testimony presented the jury with a way to reconcile these incongruities and weigh her testimony in appropriate context. Any emerging prejudice was addressed during cross-examination, as well as a favorable jury instruction given by the trial judge informing the jury of its capacity to disregard Dr. Bonomi's testimony. *See Simmons*, 470 F.3d at 1124 (finding that a jury instruction minimizes the import of any prejudice arising from the testimony of an expert witness). Accordingly, we reject LaVictor's argument.

## II.    Testimony of Prior Victims

### A.  Prior Bad Acts

#### i.  Standard of Review

This Court generally reviews evidentiary issues for abuse of discretion but there is an "on-going dispute in this circuit concerning the proper standard of review of Rule 404(b) evidence." *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015).  Sometimes, this Court will: (1) review for clear error the district court's determination that prior bad acts took place; (2) apply *de novo* review to a district court's determination that the evidence was offered for a permissible purpose; (3) and review for abuse of discretion the determination that the probative value of 404(b) evidence is not substantially outweighed by unfair prejudice.  *See, e.g., United States v. Mack*, 729 F.3d 594, 601 (6th Cir. 2013); *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012); *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010).  Other times, this Court has applied a single-tier abuse of discretion standard.  *See, e.g., United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010); *United States v. Allen*, 619 F.3d 518, 524 n.2 (6th Cir. 2010) (noting that this Circuit has "repudiated the three-tiered standard of review for Rule 404(b) determinations in light of *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)); *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002).[4]  We need not resolve this question at the moment because even if we apply the more lenient standard of "three-tiered" review, there are no grounds for reversal.

---

[4]There is also a circuit split on this issue.  *Compare United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (applying *de novo* review to a district court's determination of proper purpose under Rule 404(b)), *United States v. Akin*, 213 F. App'x. 606, 608 (9th Cir. 2006), and *United States v. Plumman*, 409 F.3d 919, 928 (8th Cir. 2005) (applying *de novo* review to the district court's interpretation and application of Rule 404(b)) *with United States v. Hite*, 364 F.3d 874, 881 n.10 (7th Cir. 2004) *vacated other grounds*, 543 U.S. 1103 (rejecting *de novo* review for this same issue), and *United States v. Gilbert*, 229 F.3d 15, 20–21 (1st Cir. 2000) (holding that, unless the district court "misapprehended the scope of [Rule 404(b) ]" inasmuch as "we review its application of Rule[ ] 404(b) . . . to the proffered evidence only for an abuse of discretion").

### ii. Analysis

Federal Rule of Evidence 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It *may,* however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b) (emphasis added). Admission of evidence under Rule 404(b) is also subject to the requirements of Rule 403 which provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.

Prior to the final pretrial conference, the government filed notice of its intent to offer evidence under Federal Rules of Evidence 404(b) and 413 concerning previous incidents of physical assault toward women. LaVictor filed two motions *in limine* to preclude the admission of the evidence, consisting of witnesses' testimony regarding the assaults. The district court conducted a hearing and reserved judgment. Following the testimony of these witnesses, the court found that the other acts occurred and that the evidence was admissible for a proper purpose—to show intent and absence of mistake—and was not unfairly prejudicial. LaVictor concedes that sufficient evidence exists in order to establish that the prior acts transpired. He only challenges the validity of the purpose for which the evidence was introduced and the issue of whether it was overly prejudicial. We address each argument below.

### 1. Proper Purpose

In order to admit prior bad acts evidence, a district court must conclude that the evidence is offered for a legitimate purpose. "To determine whether the proffered evidence is admissible for a proper purpose, the trial court must decide 'whether that evidence is probative of a material issue other than character.'" *United States v. Bell*, 516 F.3d 432, 441–42 (6th Cir. 2008) (quoting *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004)). "Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the

evidence is probative with regard to the purpose for which it is offered." *United States v. Rayborn*, 495 F.3d 328, 342 (6th Cir. 2007).

The district court heard testimony from three separate victims[5] at trial: R.M., P.T., and B.L. B.L. testified that on one occasion LaVictor, while intoxicated, punched her in the head while she was sleeping. He also struck her with a baseball bat, for which he was arrested. P.T. testified that after she broke up with LaVictor, he repeatedly threatened her. He slashed the tires of her car, broke out the windows, and damaged the engine. R.M. testified that in May 2010, she obtained a personal protection order against LaVictor because he refused to leave her house. Throughout the relationship, he physically assaulted her and made threats to kill her and her family. The district court found that the evidence was offered for two proper purposes: (1) to show LaVictor's intent to commit the act; and (2) that the assault was not an accident or mistake. Arguing that the jury impermissibly concluded from the evidence that he had a violent propensity and acted in conformity therewith, LaVictor urges this Court to reverse. We decline to do so.

Rule 404(b) is "a rule of inclusion rather than exclusion." *Carney*, 387 F.3d at 450 n.11. Contrary to LaVictor's argument, absence of mistake and intent are permissible purposes listed under Rule 404(b). This Court has held that in introducing evidence of mistake, the government's purpose "must be to prove a fact that the defendant has placed, or *conceivably will* place, in issue, or a fact that the statutory elements obligate the government to prove." *Bell*, 516 F.3d at 442 (quoting *United States v. Merriweather*, 78 F.3d 1070, 1076 (6th Cir. 1996) (emphasis added). Here, while LaVictor ultimately did not assert a defense based on mistake, it was certainly conceivable at the time that the government sought to introduce the evidence that he would make an argument, however tenuous or unconvincing, that the assault was accidental or caused by a mistaken understanding that C.B. had consented to "rough sex." We therefore see no fault in the district court admitting the evidence for this purpose.

Additionally, intent is a legitimate reason for the government to offer such evidence. This Court has previously held that the admission of other acts evidence is permitted to show

---

[5]The testimony of two victims became unnecessary at trial because the defense stipulated to LaVictor's prior domestic assault convictions, an element of the domestic assault habitual offender statute.

intent when the defendant is charged with a crime containing a specific intent element. *See Clay*, 667 F.3d at 695; *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994) (holding that "where there is thrust upon the government . . . by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may be introduced under Rule 404(b)"). The prosecutor may use 404(b) evidence to prove that the defendant acted with specific intent even if a defendant does not raise a lack of intent defense. *See United States v. Bilderbeck*, 163 F.3d 971, 977 (6th Cir. 1999). The majority of charges brought against LaVictor included a specific intent element. With that said, other acts evidence "can still be completely irrelevant to [the issue of intent], or relevant only in an impermissible way." *Clay*, 667 F.3d at 696. We must therefore still decide whether the evidence actually is probative on the issue of intent. Relying on *Clay*, LaVictor argues that the testimony of previous victims does not speak to whether C.B. consented in this case. Recognizing this to be a close question, we nonetheless disagree with LaVictor.

Evidence of intent is probative when the evidence "relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue." *Carter*, 779 F.3d at 625 (quoting *Haywood*, 280 F.3d at 721). Otherwise, as we held in *Bell*, Rule 404(b) evidence is probative of intent "when the prior [acts] were part of the same scheme or involved a similar modus operandi as the present offense." 516 F.3d at 443. Resting our conclusion on similar principles in *Clay*, we refused to admit prior bad acts evidence because we found that evidence of a 2006 assault did not show intent to assault an unrelated individual in a 2007 carjacking. "The two offenses at issue—assault and carjacking—are too unrelated and too far apart in time to be probative of whether Clay had the specific intent to do harm to [the victim]." 667 F.3d at 696. Despite LaVictor's reliance upon *Clay*, however, LaVictor's previous acts of violence against women are virtually identical to his conduct toward C.B. Similar to the cases involving the previous women, LaVictor was involved in a lengthy romantic relationship with C.B. that contained similar allegations of abuse triggered by very comparable circumstances. To the extent that there are any differences in the facts, we have held that there is no requirement that the prior act must be "identical in every detail to the charged offense." *United States v. Alkufi*, 636 F. App'x 323, 332 (6th Cir. 2016). Similarly, there is "no absolute maximum number of years that may separate a prior act and the offense charged." *United States*

*v. Love*, 254 F. App'x 511, 516–17 (6th Cir. 2007), *aff'd*, 550 F. App'x 286 (6th Cir. 2014). It appears to this Court that prior acts of violence against several different women, all of whom LaVictor had a romantic relationship with, are indicative of LaVictor's specific intent to commit sexual assault against C.B.[6]

### 2. Prejudice

The third step in the analysis requires us to evaluate whether the 404(b) evidence was overly prejudicial. We review this issue under an abuse of discretion standard. Broad discretion is given to district courts in considerations of relevance and prejudice, and those decisions will not be lightly overruled. *See United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006). In reviewing the district court's balancing of the evidence, this Court "look[s] at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Id.* Recognizing the potentially prejudicial nature of the evidence, we nonetheless find that the district court did not abuse its discretion in admitting such evidence.

LaVictor argues that the testimony of the three victims was minimally relevant and outweighed by its prejudicial value and was overly cumulative. We disagree. In the instant case, the government had minimal evidence of LaVictor's intent or absence of mistake outside of C.B.'s statement. Given C.B.'s recantation, the other assaults evidence became especially important to the government's case in order to establish intent. Therefore, the evidence was highly probative. Accordingly, we cannot find that it was an abuse of discretion for the district court to conclude that such evidence's probative value outweighed its prejudicial impact. Nor do we find the admission of the evidence overly cumulative. The mere fact that other witnesses may testify to a particular fact does not necessarily render the testimony on the point cumulative or prejudicial. *See Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014). We see

---

[6]Other circuits appear somewhat divided on whether it is appropriate to admit evidence of past sexual assault in order to show intent to commit sexual assault under 404(b). *Compare United States v. Sumner*, 119 F.3d 658, 661 (8th Cir. 1997) (holding that prior abuse of the two other children is not sufficiently similar to the defendant's alleged abuse of the victim to be relevant for showing opportunity, planning, or preparation) *with United States v. Breitweiser*, 357 F.3d 1249, 1254 (11th Cir. 2004) (concluding that testimony of defendant's prior sexual conduct with minors was admissible under Rule 404(b) "to show [the defendant's] motive, intent, knowledge, plan and preparation, and lack of mistake when he touched [the victim]" and that such evidence was more probative that prejudicial).

nothing unreasonable in the fact that the district court allowed three similarly-situated separate females to testify about instances of physical abuse.  Furthermore, a limiting instruction was given informing the jury on the proper use of the evidence, which ameliorated the risk of unfair prejudice.  *See*, *e.g.*, *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006).  Accordingly, we conclude that the district court did not abuse its discretion.

### 3. Harmless error

Even if we assume that the district court's admission of the testimony was erroneous, LaVictor, nonetheless, is not entitled to a new trial unless "it is more probable than not that the error materially affected the verdict."  *United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013).  Admission of other acts evidence constitutes harmless error "if the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error."  *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011).  In reaching this determination, this Court must take into account what the error meant to the jury, "not singled out and standing alone" but in relation to all that happened.  *United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001).

Although there is an understanding that testimony concerning previous episodes of sexual assault can be particularly prejudicial to the jury, we believe that here, even if there was such an error, the error was harmless.  "When the government presents other convincing evidence, [this Court] may deem the admission of 404(b) evidence mere harmless error."  *United States v. Layne*, 192 F.3d 556, 573 (6th Cir. 1999).  In this particular case, we are not convinced that the admission of the prior bad acts swayed the jury.  Aside from the evidence already contained in the record speaking to LaVictor's guilt, we also note that testimony covering this very specific subject—LaVictor's prior conduct toward woman—was properly put before the jury.  First, LaVictor stipulated to prior convictions of physical assault so the jury was informed of his violent tendencies.  Second, under Federal Rule of Evidence 413, the government sought, and successfully introduced very similar testimony concerning his violent tendencies toward sexual partners.  So while we recognize the potential prejudice of such prior act testimony, we cannot say that the error undermined the integrity of LaVictor's conviction.

**B. Rule 413 Evidence**

### i. Standard of Review

This Court reviews the admission of evidence under Rule 413 for abuse of discretion. *United States v. Seymour,* 468 F.3d 378, 386 (6th Cir. 2006). "Generally, an abuse of discretion is evident when the reviewing court is firmly convinced that a mistake has been made. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *United States v. Allen,* 619 F.3d 518, 523–24 (6th Cir. 2010).

### ii. Analysis

Testimony from two of LaVictor's previous girlfriends, T.F. and B.L., was admitted by the trial court under Federal Rule of Evidence 413. T.F. testified that she dated LaVictor for approximately one year, ending the relationship in 2004. After concluding the relationship, T.F. described an incident when she returned home to find her window open. After turning on the light to her apartment, LaVictor "came out of nowhere, and he got me on the—on the bathroom floor, and he raped me." (R. 153, Tr., PageID # 2024). The rape went unreported. B.L. also dated LaVictor for several years and described a similar incident of rape where he forced her to get on her knees, perform oral sex on him, and then proceeded to take her clothes off and force objects into her vagina. LaVictor argues that the district court abused its discretion by admitting the aforementioned Rule 413 testimony. According to him, the alleged sexual assaults involving T.F. and B.L. were not sufficiently similar to the incident involving C.B, are uncorroborated, and are too remote in time to have been sufficiently probative. Furthermore, he contends, the evidence should be rejected on Rule 403 grounds as overly prejudicial. We disagree, finding the evidence properly admitted.

Federal Rule of Evidence 413 provides that "[i]n a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant." Sexual assault is defined in Rule 413(d) as "contact, without consent, between any part of the defendant's body—or an object—and another person's genitals

or anus." Evidence otherwise admissible under Rule 413 is still subject to Rule 403 balancing. *Seymour*, 468 F.3d at 386. On review, this Court must give "the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id.*.

Foremost, the testimony of the witnesses need not be explicitly corroborated. *See United States v. Dillon*, 532 F.3d 379, 391 (5th Cir. 2008). In fact, such a requirement would run counter to the flexible nature of Rule 104(b), which governs the admissibility of testimony that is conditionally relevant. The rule only mandates that evidence be supported. *See* Fed. R. Evid. 104(b). In other words, a district court must determine "that a reasonable jury could find by a preponderance of the evidence that these acts were sexual assaults committed by the defendant." *Dillon*, 532 F.3d at 391; *see also United States v. Enjady,* 134 F.3d 1427, 1433 (10th Cir. 1998) (holding that a district court must make a preliminary finding that the other acts occurred). The district court held a hearing, listened to the testimony of the witnesses, observed them, and found their narratives truthful. We see no abuse of discretion.

Similarly, we see no error in the district court's weighing of the probative value of the testimony. During the hearing, the district court explicitly considered the similarity of the prior acts and stated that:

> all of these involved girlfriends of the defendant . . . . [T]he defendant acted in a rage in [B.L's] situation. Obviously, I think he did also in connection with [T.F], because he stuffed the toilet and caused overflow there, broke into her apartment. And both victims were overcome by force, violence[.]"

(R. 154, Tr., PageID # 2220). Proceeding, the court noted the "time factor here is—is several years, but other courts have held much older sexual assaults have been admitted under . . . Rule 413." (*Id.*). We agree with both of the district court's conclusions. The facts of the previous sexual assaults are quite similar to those in question here toward C.B.[7] Nor is the age of the events a reason to disqualify the evidence because other courts have admitted testimony of considerably older sexual assaults. *See*, *e.g.*, *United States v. Gabe*, 237 F.3d 945, 960 (8th Cir. 2001) (twenty year old allegations); *United States v. Meacham*, 115 F.3d 1148, 1496 (10th Cir.

---

[7]LaVictor relies upon *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138 (3d Cir. 2002) to show that there is a lack of specificity and similarity of past acts, but Johnson was a civil case under Rule 415 and the Third Circuit affirmed the trial court's decision to exclude the evidence under an abuse of discretion standard. Accordingly, the case is inapposite.

1997) (child molestation was admissible under Rule 414 that occurred twenty-five to thirty years prior.

LaVictor's final argument rests upon exclusion under Rule 403. Evidence otherwise admissible under Rule 413 is subject to Rule 403 balancing, allowing the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See, e.g., United States v. Morris*, 494 F. App'x 574, 584 (6th Cir. 2012); *Seymour*, 468 F.3d at 386. We recognize that Rule 413 evidence can be inherently prejudicial. By describing violent and sexual conduct, the evidence may have a strong propensity to evoke a visceral reaction from a lay jury. While we are sympathetic to LaVictor's argument, Congress's decision to codify Rule 413 reflects its belief of the probative nature of such testimony. As this Court explained in *United States v. Stout*, 509 F.3d 796, 801–02 (6th Cir. 2007), the codification of Rule 413, 414, and 415 represent an understanding that sexual assault is different from regular prior bad acts. This difference is either that "propensity evidence has special value in certain violent sexual misconduct cases or that the difficulty of and need for convictions for these crimes warrants a decrease in the usual protections against propensity and character evidence." *Id.* In cases where the defendant argues that a victim consented, such testimony is especially important. *See Morris*, 494 F. App'x at 583–84 (describing Congress's understanding that prior sexual assault evidence can be one of the few probative pieces of evidence to overcome a defendant's argument that the victim consented); *see also Enjady,* 134 F.3d 1427, 1433 (10th Cir. 1998) ("one of Congress' expressed rationales for Rule 413[ ] [is] the need for corroborating evidence when the alleged rapist claims consent, and there are no witnesses other than the defendant and the alleged victim."). In the matter before us, the primary question weighing upon the guilt or innocence of LaVictor is that of consent. This scenario falls precisely into the category of cases that Congress envisioned when it enacted Rule 413. Accordingly, we cannot say that the district court abused its discretion.

**III.     Other Evidentiary Matters**

**A.  Admission of Grand Jury Testimony**

**i.  Standard of Review**

Admission of grand jury testimony is reviewed for abuse of discretion.  *See United States v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981); *see also United States v. Young*, 316 F.3d 649, 658 (7th Cir. 2002) (same).  But if a defendant fails to properly object to the admission of a piece of evidence, this Court applies plain error review.  *United States v. Marrero*, 651 F.3d 453, 470–71 (6th Cir. 2011).  Under plain error, a defendant must show: (1) error, (2) that "was obvious or clear," (3) that "affected defendant's substantial rights," and (4) that "affected the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Warman*, 578 F.3d 320, 345 (6th Cir. 2009) (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008).

**ii.  Analysis**

During the course of the trial, the government called C.B. to the witness stand.  After C.B. testified that the sex was consensual and no physical assault occurred, the government moved to admit C.B.'s grand jury testimony into evidence as a prior inconsistent statement.  LaVictor raises three separate arguments that all relate to the government's decision to introduce C.B.'s prior testimony.  First, LaVictor argues that the district court abused its discretion by allowing the grand jury testimony to be admitted as an inconsistent statement.  Second, LaVictor claims that the government violated his due process rights by calling C.B. to the stand for the sole purpose of impeaching her.  And finally, LaVictor contends that the district court should not have admitted the grand jury testimony in the manner that it did so.  We consider each argument in turn.

**1.  Admission of Grand Jury testimony**

Arguing first that the district court erred with respect to admission of the grand jury testimony, LaVictor contends that such testimony was not actually inconsistent with C.B.'s trial

testimony.**8** Prior statements "inconsistent with the declarant's testimony and [] given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition" are not hearsay. Fed. R. Evid. 801(d)(1). This rule plainly allows for the admission, as substantive evidence, of grand jury testimony that is inconsistent with the witness' current testimony. *See United States v. Mayberry*, 540 F.3d 506, 516 (6th Cir. 2008); *United States v. Hadley,* 431 F.3d 484, 511–12 (6th Cir. 2005). C.B.'s grand jury testimony—made under oath—can be admitted if it is in fact inconsistent with her trial testimony.

The trial court considered the grand jury testimony and found it to be inconsistent. We perceive no abuse of discretion. A trial court is afforded wide latitude in determining whether an inconsistency exists. *See Distler*, 671 F.2d at 958. This may result in a district court admitting evidence from grand jury testimony that in some parts corroborates the in-court testimony. *Id.* (noting that admission of grand jury evidence is appropriate even if it corroborates some in-court testimony as long as the prior statements "are predominantly inconsistent with the in-court statements, and the corroborate portions are needed to set the whole in context.") Such determinations are "properly left to the discretion of the trial court." *Id.* We have further recognized that inconsistency is defined broadly to include testimony that reflects "limited and vague recall of events, equivocation, and claims of memory loss." *Mayberry*, 540 F.3d at 516. Similarly, our sister circuits have also countenanced a broad definition of inconsistency. *See, e.g., United States v. Cowan*, 528 F. App'x 278, 281 (4th Cir. 2013). C.B.'s grand jury testimony affirmed the veracity of her previous affidavit. Moreover, it recounted with stark detail that a sexual assault transpired. She averred that she failed to consent on the night in question. Although there appear to be moments of indecision or hesitancy in her testimony, the overwhelming thrust of the grand jury record reflects a description of a violent episode of sexual assault. This is obviously inconsistent with the testimony she offered on the witness stand—that she engaged in consensual sex. Where, as here, the decision making of the trial court is supported by the record, we observe no grounds for reversal.

---

**8**We note that C.B.'s prior written statement given to Officer Menard in the hospital was plainly inconsistent with her trial testimony. But, as both parties concede, the written statement is hearsay and cannot be introduced for the truth of the matter asserted. It can, however, be used to impeach C.B. *See* Fed. R. Evid. 613(b).

**2. Due Process Claim**

LaVictor next argues he suffered a violation of his due process rights. Specifically, LaVictor argues that the prosecutor violated his Fifth Amendment rights by calling C.B. as a witness for the sole purpose of placing the inconsistent statement before the jury. In so doing, LaVictor cites this Court's decision in *United States v. Shoupe*, 548 F.2d 636 (6th Cir. 1977) to support the aforementioned proposition of law. He claims that this Court reversed a conviction when it was based on "the entire substance of a witness's disavowed, unsworn prior statements" because it "went beyond the permissible limits of fairness." *Id.* at 643–44. We reject this argument.

Initially, we note that under Federal Rule of Evidence 607, any party, including the party that called the witness, may attack a witness' credibility. In *Shoupe*, we recognized a limited exception to this general rule. The government called a co-defendant to testify concerning his role in the criminal enterprise. During the testimony, the prosecutor asked the co-defendant whether anyone accompanied him into the bank. When the witness failed to answer, the prosecutor sought to impeach him through an inconsistent statement by producing a memorandum prepared by a federal agent, never seen by the witness, which the government read from to allegedly refresh the witness's memory. At no point did the witness acknowledge making the statements contained in the memorandum. No other evidence tied the defendant to the crime. Consequently, this Court held that the district court should have been alerted to the possibility that the memorandum "lacked sufficient indicia of reliability to justify its blanket disclosure to the jury, even for a limited purpose." *Shoupe*, 548 F.2d at 642. Our decision was premised upon reliability concerns that simply do not exist here.

The circumstances of LaVictor's case are patently different. C.B. testified under oath. She acknowledged making the written statement and affirmed the veracity of its content. Therefore, we have no question that the statement was made by her. Additionally, in her grand jury testimony she testified to the accuracy of the statement and the information contained therein. To the extent that there is any concern regarding due process—in the form of fear that the jury may confuse the issues—we have stated that a limiting instruction is an effective way to alleviate those concerns. *See Rush v. Illinois Cent. R. Co.*, 399 F.3d 705, 721 (6th Cir. 2005).

Such a limiting instruction was given to the jury. Consequently, we see no reason to conclude that the prosecutor violated LaVictor's due process rights.

### 3. Admission of the entire transcript

The final argument LaVictor raises concerns the decision of the district court to allow the entire grand jury transcript to be admitted directly into evidence without providing an explanation or cautionary instruction. LaVictor did not object during trial and concedes that in such a circumstance this Court reviews for plain error. Equally, the government concedes that the preferred method for introducing testimony involves reading it out loud. A dispute exists as to whether the error in question was plain and whether it impacted LaVictor's substantive rights.

This Court has held that a district court abuses its discretion when it allows for grand jury testimony to be presented as an exhibit to the jury. *See, e.g., United States v. Smith*, 419 F.3d 521, 527 (6th Cir. 2005). Taped or recorded testimony creates a potential for double exposure to selected testimony that may improperly influence a jury. *United States v. Walker*, 1 F.3d 423, 430 (6th Cir. 1993); *see also Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 730 n.2 (6th Cir. 1994) (a "party's right to admit prior statements in a document . . . does not necessarily entitle [ ] that party to submit the documents as an exhibit to the jury. Permitting the document to go to the jury room could unduly prejudice the cross examination."). With that said, not all decisions to admit transcript testimony amount to an abuse of discretion. *See United States v. West*, 948 F.2d 1042, 1044 (6th Cir. 1991) (decision to admit tapes were within the sound discretion of the court). As a general rule, a district court must offer some justification for its decision when deciding to admit the transcript directly into evidence. *Smith*, 419 F.3d at 528 (a district court must provide some reason for "eschew[ing] the established practice of simply reading the transcript of the testimony aloud to the jury."). The trial judge failed to make any findings or offer any explanation for its decision to present the full transcript to the jury. We find that this constituted an error.

However, even assuming that the error was, in fact, plain, there is no indication that the decision had a substantial impact upon LaVictor's rights. LaVictor insists that remand is necessary because C.B.'s grand jury testimony was taken out of context. And that but for the

transcript, the government was left with little evidence from which it could have convicted him. The record, however, belies LaVictor's claim. This Court has emphasized that any prejudice from having grand jury testimony admitted can be ameliorated by watching the witness testify. *Smith*, 419 F.3d at 529. The jury had the benefit of seeing C.B. testify at trial twice. LaVictor had a full opportunity to cross-examine her and place her grand jury testimony in context. And finally, there was substantial evidence introduced at trial from which a jury could have convicted LaVictor separate from the transcript. Because he failed to preserve the objection, LaVictor has the burden of showing that the district court's decision affected the outcome of the case. LaVictor has not made such a showing. Similarly, we reject his argument concerning a lack of cautionary instruction. We agree, as LaVictor contends, that "when a trial court permits a deliberating jury to review trial testimony, the trial court must give the jury a cautionary instruction." *United States v. Rodgers*, 109 F.3d 1138, 1144–45 (6th Cir. 1997). But again, under plain error review, we fail to see, in light of the overwhelming evidence already before the jury, what prejudice LaVictor suffered. Therefore, we reject his argument.

## B. Jury Instructions

### i. Standard of Review

This Court reviews a district court's decision not to give proposed jury instructions for abuse of discretion. *United States v. Ursery*, 109 F.3d 1129, 1136 (6th Cir. 1997). A refusal to give requested instructions is reversible error only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case. *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993).

### ii. Analysis

LaVictor raises two separate arguments with respect to the jury instructions that were provided at trial. The first argument pertains to the jury instruction given on consent. LaVictor proposed jury instructions to the district court. The district court rejected the instructions. LaVictor claims this constitutes an abuse of discretion. Additionally, LaVictor now argues, for

the first time on appeal, that the district court erred by providing inappropriate instructions for the Rule 413 evidence. We review this argument for plain error.

### 1. Jury Instructions on consent

LaVictor argues that the district court erred by rejecting his instructions on consent. At trial, the district court instructed the jury that consent was a factor for the jury to consider. Claiming error, LaVictor contends that consent is more than just a factor to be considered by the jury because if C.B. had consented, then LaVictor would have had a complete defense. This Court is unpersuaded.

The district court does not have to accept the exact language of a defendant's proffered jury instructions. *United States v. McGuire*, 744 F.2d 1197, 1201 (6th Cir. 1984) ("the district court has great latitude in phrasing [jury instructions]."). LaVictor cites two cases, neither of which provides any support for his contention that the jury instructions were incorrect. *See United States v. Boyles*, 57 F.3d 535 (7th Cir. 1995) (noting consent instructions are only given in rare cases because the presence of force will generally obviate any defense of consent); *United States v. Anderson*, 467 F. App'x 474, 479 (6th Cir. 2012) (overturning a district court's decision not to admit the defendant's proffered Rule 412 evidence). Despite LaVictor's contention that this does in fact represent one of those rare cases where a victim consents to sexual intercourse involving force, we find the district court's instructions adequate to address the matter. Consent, as the jury was instructed, was a factor in the case. Whether it was the sole factor or one of several to be weighed by the jury is immaterial.

### 2. Instruction on Rule 413

Next, LaVictor argues that the district court erred in its Rule 413 instruction to the jury, but concedes we review for plain error. In the context of challenges to jury instructions, "[p]lain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006) (quoting *United States v. Combs,* 33 F.3d 667, 669 (6th Cir. 1994)).

The district court instructed the jury that evidence of uncharged sexual assaults could be used as evidence that the "defendant committed the crimes charged." (R. 155, Tr., PageID # 2471–72). LaVictor argues that the court was clearly "required to instruct the jury that consideration of other sexual assaults was limited to any matter to which it is relevant" and not as evidence of guilt. He claims that this error endowed such testimony with the "imprimatur of a judicial finding" and impacted the substantial rights of the defendant. (*Id.*). We reject this argument. Rule 413 is clear that other instances of sexual assault "may be considered for [their] bearing on any matter to which it is relevant." This includes the evidence's bearing on the guilt or innocence of the defendant. *See Seymour*, 468 F.3d at 384–85. Any purported inconsistency between the trial court's instructions and the precise language of Rule 413 has no weight in the jury's consideration of the matter. Certainly, the disparity does not rise to the level of a "grave miscarriage of justice."[9]

## C. Cumulative Error

### i. Standard of Review

In order to obtain a new trial based upon cumulative error, LaVictor "must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Walker*, 506 F. App'x 482, 488 (6th Cir. 2012) (quoting *United States v. Trujillo*, 376 F.3d 595, 614 (6th Cir. 2004). A trial need not be "perfect" to withstand a due process challenge. *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000).

### ii. Analysis

No basis exists for granting LaVictor's request for a new trial. A number of arguments regarding errors that LaVictor points to are, as previously explained, lacking in merit. Only two arguable errors exist on the record before us: (1) the admission of 404(b) evidence concerning prior acts of physical assault against women; and (2) the admission of grand jury testimony in

---

[9]The case that LaVictor cites is inapposite. In *United States v. Di Stefano*, the trial court instructed the jury that false exculpatory statements were admissible as evidence of guilt. 555 F.2d 1094, 1104 (2d Cir. 1977). The Second Circuit found that such instruction was actually an incorrect statement of the law. In contrast, the district court's instructions accurately stated the law.

transcript form without an appropriate jury instruction.  The latter of these was not even raised during trial.  With respect to the first claim of error, as we have previously stated, testimony that is independently corroborated by admissible evidence, even when combined, does not prejudice a defendant.  *See Warman*, 578 F.3d at 349.  Ample evidence existed in the record showing LaVictor's tendency to engage in physical abuse of women.  Similarly, any prejudice that resulted from admission of the transcript was minimal at best.  Even accounting for the combined impact of these two errors, we cannot say that LaVictor's trial was fundamentally unfair.

## IV.    Sufficiency of the Evidence

### A.  Standard of Review

This Court reviews *de novo* the denial of a motion for acquittal based on insufficient evidence.  *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010).  We must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Wettstain*, 618 F.3d 557, 583 (6th Cir. 2010).  "[A]n appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal, rather than submitting the case to the jury."  *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988). A motion for a new trial under the Federal Rule of Criminal Procedure is reviewed for abuse of discretion and granted only "in the extraordinary circumstances where the evidence preponderates heavily against the verdict."  *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007).

### B.  Analysis

LaVictor challenges the sufficiency of the evidence pursuant to Federal Rule of Criminal Procedure 29.  In the alternative, he requests a new trial under Federal Rule of Criminal Procedure 33.  A defendant bears a heavy burden when asserting insufficiency of the evidence arguments.  *Wettstain*, 618 F.3d at 583.  "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999).  Evidence must be interpreted "in

the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008). All reasonable inferences must be made to support the jury verdict. *Wettstain*, 618 F.3d at 583.

LaVictor raises a general argument that insufficient evidence was presented, in light of C.B.'s recantation, to prove the sex was not consensual. LaVictor's argument relies heavily upon the presumption that this Court will accept his previous arguments for exclusion of evidence. However, as we reiterated throughout this opinion, the evidence of guilt against LaVictor was considerable even without her testimony. Mere "[c]ircumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). Ample direct and circumstantial evidence of guilt existed. Moreover, C.B.'s recantation does not necessarily benefit LaVictor. The jury heard expert testimony on victim recantation, and could have relied upon this information in rejecting C.B.'s testimony. Viewing the totality of the evidence in the light most favorable to the prosecution, as we are required to do, we must reject LaVictor's challenge to the sufficiency of the evidence. Aside from this general argument, LaVictor also raises specific challenges to his convictions for Counts One, Three, Five, and Six. We review each argument below.

### i. Count One: Attempted Sexual Abuse

LaVictor first argues that there is insufficient evidence to convict him of Count One. The relevant statute, § 2242(2)(B) prohibits "knowingly . . . engag[ing] in a sexual act with another person if that other person is . . . physically incapable of declining participation in, or communicating willingness to engage in, that sexual act." LaVictor contends that the government failed to provide any evidence that C.B. was incapable of declining participation in a sexual act at the time of the alleged attempt. This argument is refuted by the record.

Because LaVictor is charged with the inchoate crime of attempt, the government need only show that he took a "substantial step" toward committing the sexual act. Incapacity can arise due to sleep, intoxication, or drug use and is punishable under the statute. *See United States*

*v. Fasthorse*, 639 F.3d 1182, 1184 (9th Cir. 2011) (a reasonable jury may conclude that a person who is asleep when a sexual act begins is physically unable to decline participation); *United States v. Carter*, 410 F.3d 1017, 1028 (8th Cir. 2005) (sufficient evidence existed even though the victim was awake but under the effects of marijuana because this "may have hindered her ability to object."). C.B. testified that there was a moment after midnight that she could not recall and when she woke up she was lying on the floor naked. She further testified that upon asking for her clothes, LaVictor became violent. From this testimony, a reasonable jury could conclude that LaVictor took a substantial step toward engaging in sex by undressing her at a time when she was incapable of consenting.

### ii. Count Three: Aggravated Sexual Abuse

In the indictment, the government charged LaVictor with "penetrat[ing] the anal opening of C.B." (R. 1, Indictment, PageID # 3). LaVictor now argues that the government failed to establish an anal injury or penetration. However, the record belies this argument.

First, Christine Simpson, a nurse, testified that C.B. told her that LaVictor may have used a wine bottle and "put it in both areas. [The witness] asked her, you know, what she meant by both areas . . . did he put it in her, you know, bottom or anal region? And she said yes."(R. 153, Tr., PageID # 1856). Further testimony stated that C.B. expressed concern about her rectal area because "she was worried about having a bowel movement. [C.B.] said there was also some trauma to her rectum area, and she was scared it was going to hurt when she had a bowel movement." (*Id.* at 2008). And finally, C.B. admitted on direct examination at trial that she was penetrated anally. Despite LaVictor's assertion that the only evidence of anal penetration comes from improper evidence, this is not the case. Nor is there a need, as LaVictor claims, for the government to show an anal injury. Under the charged offense, penetration is sufficient. And the direct testimony of witnesses coupled with C.B.'s personal statement is more than sufficient for a jury to conclude that anal penetration took place.

### iii. Count Five: Habitual Domestic Assault

LaVictor raises an additional argument that because that he is not a current or former spouse, he cannot be convicted under the habitual domestic assault statute. Under the relevant

statute, 18 U.S.C. § 117, in order to convict, a jury must find that a defendant has committed a domestic assault and has a final conviction on at least two separate prior occasions for offenses that would constitute "any assault, sexual abuse, or serious violent felony against a spouse or intimate partner . . . ." The statute defines domestic assault as "an assault committed by a current or former spouse . . . by a person who is cohabitating with or has cohabitated with the victim . . . or by a person similarly situated to a spouse." 18 U.S.C § 117(b). LaVictor stipulated to two prior convictions. However, believing the statute does not apply to him, LaVictor now points to the fact that he is not cohabitating with defendant, nor is he a spouse, and requests that this Court overturn his conviction.

As a threshold matter, this argument was not raised below. "Although specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived." *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002). In such a circumstance, the burden for prevailing on a sufficiency challenge is even more demanding than usual. *See United States v. Guadarrama*, 591 F. App'x 347, 351–52 (6th Cir. 2014). Such claims are reviewed under the "manifest-miscarriage-of-justice standard, and [this Court] will 'only reverse a conviction if the record is devoid of evidence pointing to guilt.'" *Id.* (quoting *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)). LaVictor does not meet this burden.

Although we have not defined what constitutes an "intimate partner," a similar domestic assault statute states that a "spouse or intimate partner" includes "a person who is or has been in a social relationship of a romantic or intimate nature with the abuser, as determined by the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship." 18 U.S.C. § 2266(7)(A)(i)(II); *see United States v. St. John*, 716 F.3d 491, 493 (8th Cir. 2013) (applying the definition to §117). Reading the plain language of the statute, we see no reason to limit the definition, as LaVictor encourages, to cohabitating partners. Rather, we look to the general nature of their relationship to determine, as the Eighth Circuit has done, whether C.B. and LaVictor constitute intimate partners. LaVictor's defense counsel informed the jury that LaVictor and C.B. engaged in a lengthy, romantic relationship. C.B. testified that she has known LaVictor for over twenty-three years and has been romantically

involved with him for five. She traveled back and forth from Canada to visit him every weekend. Everyone was aware of their intimate relationship. They had plans to get married. Accordingly, we find that given the frequency of their interactions, the length of the relationship, and its intimate nature, sufficient evidence was presented to the jury in order to convict under § 117.

### iv. Count Six: Attempted Witness Tampering

Last, LaVictor argues that there is insufficient evidence to convict him of attempted witness tampering. As explained by the district court, to convict LaVictor, the government must show he "knowingly [attempted] to corruptly persuade C.B. to provide a false written statement with the intent to influence, delay, or prevent the testimony of C.B. in an official proceeding . . . in violation of Title 18, United States Code, Section 1512 (b)(1)." (R. 155, Tr., PageID # 2465) (the district judge instructing the jury). LaVictor believes that simply by sending C.B. a letter he cannot be convicted under the statute. Rather, he contends that in order to "corruptly persuade," he must engage in some additional conduct either involving intimidation or a threat. In support of this argument LaVictor points to a number of decisions that hold that merely requesting a witness withhold information from investigators is insufficient to support a conviction. *See United States v. Weiss*, 630 F.3d 1263, 1275 (10th Cir. 2010); *see also United States v. Farrell*, 126 F.3d 484, 489 (3d Cir. 1997) ("[M]ore culpability is required for a statutory violation than that involved in the act of attempting to discourage disclosure in order to hinder an investigation."). We reject his argument because LaVictor did more than simply encourage C.B. not to testify against him.

This Court has held that urging a witness "in an official proceeding . . . [a] term encompass[ing] both federal criminal trials and grand jury testimony" to lie is sufficient evidence of witness tampering. *United States v. Burns*, 298 F.3d 523, 540 (6th Cir. 2002); *see also United States v. Montgomery*, 358 F. App'x 622, 629 (6th Cir. 2009) (noting that evidence showed the defendant sent letters to a witness urging him to lie about the basis of their relationship, and that was sufficient evidence of a conviction). LaVictor's conduct in this case was tantamount to an encouragement to lie. He wrote out an affidavit and requested that C.B. copy it in her own handwriting and present it to the court. Because he was charged with the inchoate crime of

attempt, it is immaterial whether or not he successfully persuaded C.B. to do so.  Rather, by his efforts to get C.B. to refute her grand jury testimony, he took a "substantial step" toward witness tampering. Accordingly, we find his conviction supported by sufficient evidence.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.